May it please the Court, my name is Elizabeth Theron and I represent the EEOC. And as we said, continually move that microphone just over a little bit, it does make a big difference. Sorry. I find if I don't do that, no one can hear me either. I'd like to reserve five minutes for rebuttal, if I may. Your Honors, whether the evidence of age discrimination in this case is viewed as direct, circumstantial or a mixture of both is clearly consistent with both the nature and the quantity of evidence that this Court has previously held sufficient to survive summary judgment. This is not a case involving only one or two or even multiple ambiguous remarks. Rather, it involves extensive repetition of known ageist comments and stereotypes by the decision makers made in front of several different audiences, along with other record evidence that would allow a jury to infer that the defendant fired the three class members at issue here because of their ages. You know, the problem we've had with these cases is we've allowed certain comments to take place that we haven't considered them really sufficient. Old folks club or something. And of course, if you're an old person, you read a lot into it. But we've said it really doesn't show a state of mind of people just because they refer to those comments. And I've had some difficulty figuring out at what point does it show some real intent on the part of an employer that they're really firing this person for this reason. Our cases aren't that helpful. I mean, you can read one case and go one way and another case go another direction. How are we supposed to handle that issue? That's a very good question, Judge Wallace. And I think that we sent this Court a Rule 28J letter about the Eighth Circuit's decision in Baker v. Silver Oak Senior Living Center, which we find to be particularly helpful on this point. And of course, we know that this decision isn't binding on this Court in any way. But that, the way the Eighth Circuit handled the remarks in that case, makes a very important point about the proper way of handling these kinds of remarks in context. While some remarks may be innocuous by themselves or taken out of context, they can support an inference of age discrimination when they're made by decision makers who've made other explicitly biased comments. And that decision is actually very much consistent with the law of this Court, which has rejected, as you've noticed, these kinds of claims where you have only these ambiguous comments that stand on their own with no other evidence of age discrimination to support them. But the Baker Court noted that when you have those comments that are made as part of a larger picture of age discrimination, it's improper to exclude them from the evidentiary analysis. And in this case, I think the picture of age discrimination in this case is really very much consistent. It stands in stark contrast to the cases that I think you're thinking of, which are cases like Pottinger and Nibs and Nesbitt. In this case, David Neel testified that Berg Mishurta, who's the vice president of TIN's international group and the senior decision maker with respect to all three employment decisions here, he makes repeated explicit comments reflecting age animus against older workers. He told a subordinate in his 20s, Alex Salomon, that he wished his team were younger and had more energy, and that the older people should move on and learn new tricks. He vetoed job candidates expressly because of their relative older age and its implications for their energy and creativity. He told one job candidate, this was Mike Ulrich, that he wouldn't be a good match for a position because, and I quote, it's a young man's game and a young man's job that requires adroitness, flexibility, new thinking, and young blood. Suppose that's true. That is, suppose I apply to play for the Giants. I may have been good before. Sure. But I'm over the hill, and that's an analysis. Right. There are some jobs that younger people do better than older people. Why is that necessarily discriminatory? Well, Congress addressed this issue, I think, in enacting the Age Act, and the Supreme Court addressed it in Hazen Paper, as the amicus in this case pointed out in its Crawford brief, and as we said in our brief, it's perfectly fine for an employer to make decisions about whether employees or job candidates are qualified for a job based on the job qualifications. That's fine. If you're not qualified to play for the Giants because you can't run fast enough or you can't pass well enough, that's perfectly legitimate. But what Congress and the Supreme Court have said are not legitimate is to use your age as a proxy for that decision. So they're free to not hire you to be a running back, but they have to make that decision based on whether you're qualified for the job. You're from the East Coast. You're thinking he's talking about the New York Giants. He's talking about the San Francisco Giants. I was wondering why I had to pass to be a baseball player. My bias is showing. I'm sorry. Yes, indeed. Your Honor. The run part was okay, but it got to the pass, and I said, okay. What is she talking about? I didn't mean to divert you from your argument. I'm very sorry. Go ahead. But how do you do that? What evidence do you have to have to show that it really shows something other than analysis or point of view as to what's the best person for a job? Well, again, one important thing to keep in mind about this case, Your Honor, is that this is summary judgment. And so at this point, the question is whether a reasonable jury could look at the evidence in the record and find that age was the but-for cause of the decisions that the adverse employment actions that were taken in this case. So the answer is, if an employer looks at a job candidate or an employee and says, you know, I'm not hiring you or I'm firing you because you're not doing your job because, you know, I look at your evaluations and, you know, your sales numbers are too low. You're not making enough sales calls. You know, rather than saying, I think you're too old to go out in the Phoenix heat, you know, okay, here's your metric. You're supposed to be making 50 sales calls a week. You're making 12. That's too low. That's a way to establish that someone isn't doing their job, but it's not a way to establish that someone isn't doing their job by saying, I think you're too old to make sales calls in the heat. And the striking thing about that incident is that that person was not only he was in his 50s. We're not talking about someone who's 95. But that person was a job candidate. That person wasn't even someone who was failing to do a job. So we're not even talking about where there was evidence that the person was not holding up his end of the bargain. This is someone who hadn't even been given a chance and, in fact, wasn't given a chance because of his vastly older age at being 50-something. So, you know, again, as we argued in our briefs, you know, when you look at the record evidence in this case, there's more than enough for a reasonable jury to conclude that age discrimination was the real motivation for the adverse actions here. And, you know, the number and the nature of the remarks at issue in this case, you know, stands in really stark contrast to the cases where this Court has held that there was not enough. But the other thing to note about this case that's important is that, you know, certainly there are a lot of remarks here, and the remarks are pretty explicit. But this isn't a case that's just about remarks. There's other evidence in the record from which a reasonable jury could also conclude that age was what really motivated the decisions here. With respect to David Neal, as we explained in our brief, there was evidence in the record not only that the overall profitability of the Phoenix plant was largely beyond his control, but that due to the fully integrated nature of the paper industry, meaning that TIN, the company, owns both the paper mills and the box plant itself, TIN knew full well that various factors affecting that plant's profitability were, in fact, within the control of senior management at TIN rather than David Neal's control. There's also evidence in the record that shortly after Neal is fired, TIN, in fact, shifted its entire business strategy for that plant away from a focus on profitability and toward a focus on maximizing mill capacity. So, in other words, let's just get as many boxes out of this plant and use our mill capacity to the full extent as a mechanism to, excuse me, as a mechanism to maximize the profitability writ large, the company's profitability rather than the plant's profitability. And that's evidence that would allow a reasonable jury to conclude that TIN didn't, in fact, blame Neal for Phoenix's lack of profitability, as it now claims, but that that explanation is, in fact, a pretext for age discrimination. With respect to Cliff McGraw, to begin with, a jury could take note of the fact that TIN treated his alleged performance deficiencies as production manager in a completely different manner than it did those of his 20-year younger successor, Felipe Juarez. While McGraw was effectively demoted to logistics manager for four months and subsequently terminated, Juarez, whose performance was so poor that Misurda himself testified that they were having a rough time with him in the position, was promoted by Misurda to a potentially more lucrative position in TIN's Mexican operations division. A jury could also take note of the fact that although TIN cited reduction of fixed costs as its reason for eliminating the logistics manager position and terminating McGraw, TIN, in fact, created that position during the same time period when it's allegedly trying to reduce its fixed costs. So these inconsistencies, again, are more than enough to support a reasonable jury's finding that TIN's proffered reasons for terminating him are a pretext for age discrimination. Finally, with respect to John Vinneco, a reasonable jury could find that TIN's reasons for selecting the much younger Cervantes for the consolidated controller position and terminating Vinneco were pretextual, based not only on Vinneco's superior qualifications, but on how Cervantes' lack of qualifications, in fact, played out in her extremely poor performance in the position. Although Garza testified that Cervantes was chosen due to her ability to speak Spanish and her knowledge of Mexican tax law, both Flores and Vinneco testified that neither of those skills were actual job requirements, and a jury could credit that testimony. A jury could also take note of the fact that Cervantes was replaced by Arnie Kessler, who was a plant controller, as Vinneco had been, was younger than Vinneco, although older than Cervantes, and did not speak Spanish or have knowledge of Mexican tax law. When all of this evidence is viewed in conjunction with the remarks in the record, there's more than enough for a reasonable jury to find that age discrimination was the real reason that all three men lost their jobs in this case. This was true before the Supreme Court's decision in Gross, and it remains just as true after Gross, which held only that the burden of proof remains with the plaintiff in age cases to show that age was the but-for cause of the adverse action at issue. Based on the evidence in the record, a jury could readily find that Neil McGraw and Vinneco would not have been fired but for their ages, and accordingly request that this Court reverse the district court's grant of summary judgment and remand for trial. So I'll reserve the remainder of my time for rebuttal.  Thank you, counsel.  I'll try this first. Yes, ma'am. Good morning. My name is Camille Olson, and I'm here with Sinter-Bentley today on behalf of TIN, the appellee in this case. I think it's important to answer the questions that you've posed to us   and to answer the questions that you've posed to us. And also to look at the specific facts of this case as we consider this appeal by the EEOC. There are three individuals who are at issue who were terminated at the TIN plant, one in January of 2003, one in the middle of 2004, and one in the end of 2005. The last two terminations were layoffs, and they were terminations that were done by Mr. Garza, somebody who was not mentioned by the EEOC in the EEOC's earlier comments here today. Mr. Neal, who was the first person who was terminated, was the manager, the plant manager of the plant in Arizona. He's somebody who was in that position when TIN purchased that plant along with a number of other plants in 2002. When the plant was purchased, Mr. Neal had been in a position where the plant had been not profitable for over five years. He testified in his own deposition. He was concerned that he was going to be terminated by the prior owner, Gaylord, because he couldn't get the plant profitable. When Mr. Mishurda spoke with Gaylord's equivalent to his position right at the very beginning of the acquisition, Gaylord's manager told Mr. Mishurda, I think you need to hold him responsible. I think that he's not going to be able to turn it around, and I think that he should be terminated. Mr. Mishurda didn't terminate him then. Mr. Mishurda instead gave him an opportunity to see if, in fact, he was able to turn around the plant. The record evidence is undisputed that throughout that year until the following January, so from April until the following January, he wasn't able to make the plant profitable. Mr. Mishurda explained there were three reasons why Mr. Neal was terminated. The EEOC does not even mention to you today, nor in any of its briefs, any reason to believe the second or third reason was a pretext. The second reason being Mr. Neal never accepted Mr. Garza as his direct manager. The third reason being that Mr. Neal spent a lot of his time talking to people about would he be able to get the change of control and approximately an additional $400,000 because Mr. Garza was now who he was reporting to. Those were two of the three reasons that are undisputed in terms of the reasons proffered by TIN for Mr. Neal's termination, and yet, in fact, the EEOC doesn't address them. In addition, with respect to Mr. Mishurda, he's the decision-maker with respect to Mr. Neal. This case is very different than the Silver Oak case. There's really no comparison between Baker versus Silver Oak, the Eighth Circuit case that's presented to you on brief and discussed at length here this morning. In that case, there is direct evidence that the decision-makers told the supervisor of that center, you need to make decisions based on people's youth. I'm making decisions based on that. There was direct evidence that that was the reason, Your Honor. That's true. And I think your case would be a much stronger one if you're coming here after a trial, but we have to come to the conclusion the district court was correct that no reasonable basis for the termination. And I'm sympathetic with you because as you read the opinion of the district judge, it sounds quite logical. But on the other hand, there does seem to be a series of statements that were made which, in context, could lead a jury to believe, it seems to me, at least it could be argued could lead the jury to believe that there is a question here, that there's a disputed question of fact that should have gone to the jury. How do you respond to that? Your burden is a tough one because it's a summary judgment. If it was after trial, I don't think we'd even have heard argument on the case. Thank you, Your Honor. It's a very good question, and this is how I respond to that. When you look at each and every one of the comments, you have to understand the context of it. And each and every one of the comments, there is not one comment in which Mr. Mishurda, who is the decision-maker on Neal, he's not the decision-maker on the other two plaintiffs, but let's talk about Neal at this point. With respect to Neal, there's not a comment that says don't hire him or terminate him or take an adverse action because of his age. There is no direct evidence of discrimination. There isn't any. No, I'm sure there isn't. There rarely is. But that isn't the point. The point is, is there sufficient indirect evidence, circumstantial evidence, to go to the jury? This circuit is clear that circumstantial evidence must be specific and substantial to go to the jury. All of the comments in front of you, and you can go through them one by one, and when you look at, for example, Alex Solomon's comments, you've got to read the whole record. The quotes that are quoted to you by Solomon, two pages later, he says, well, no, he never said young. And, no, I don't believe he meant it had anything to do with the person's age. I believe that when he made the comments to me, what Mishurda was talking about was I needed people to turn around that plant. It hadn't been profitable for six years. We needed people not doing things in their old ways. We needed people who were energetic. We needed people who were out there trying creative, dynamic, new ideas that would make a difference. That's Solomon himself who says that about Mishurda's comments. He said, no, I didn't, it wasn't that he was saying I don't want old people. And, in fact, look at his age. Mishurda at the time was in his late 50s. And there's no evidence that he's replacing anybody with individuals outside the protected age class. That, too, is a relevant consideration. The comments that are made are ambiguous at best. And if you add five ambiguous comments together, if you add ten ambiguous comments together, Silver Oak, the case that is presented to you, doesn't say that that adds up to circumstantial evidence or direct evidence of discrimination. It says that you've got to have those comments attached to evidence that is direct evidence of discrimination. And there is none in this case. For the direct evidence to be direct evidence of discrimination, the comments have to not allow an inference to be drawn. And, in fact, when you read the context of every one of the comments, there's no question that people are focused on. We want people to not just be sitting there. And it's interesting, the comments that are quoted to you today are with respect to sales managers and sales employees. None of the three plaintiffs were in the sales department. None of those comments related to any of the three claimants that are present here in terms of this case. But with respect to those, what Mishurta is saying is we need people to drive this plant. We need people not to, on the sales front, be content to sit and just collect the existing accounts. We have to have more sales. And, in fact, that is not evidence of age discrimination. The fact that you don't want people who are going to do things the old way. You don't want people who they were managers, now they're applying for a sales rep position. Are they going to be driving the business or not? What are they going to do in that business? He didn't say what is somebody's age and stop and say because of that I don't want to hire him or I'm going to treat him differently. His focus was always, when you read the context, I want to understand are these people going to move this business forward. What is their attitude? That's what I care about. And when you read every comment, I promise you, every comment has that context attached to it. It's not about are they old. Garza, who he puts in place, is 41 years old. The second plaintiff who is discussed by the EEOC, Mr. McGraw, is somebody who was hired without objection by Mr. Mishurta. Mr. Mishurta told Mr. Neal, who hired him, and he was 61 years old, I believe, when he was hired, you know, I'm not sure that he's the best candidate for the job, but I'm not going to veto your decision. Mishurta did veto a decision when Neal brought him somebody who was younger than McGraw for that same position. Mishurta said, I'm sorry, I'm vetoing that person. That person I don't think has what it takes to drive this business. That person was younger than McGraw, but McGraw was hired and he said, you know, I may disagree that he's the right person, but that's your call. I'm going to let you put him in place and we'll see how it works out. But who made the decision on McGraw and Venenco, the other two? Not Mishurta. The record evidence is undisputed that the decision was made by Garza, again, a person in the protected class, a person who there is absolutely no evidence of direct or circumstantial age discrimination. There are three conversations that the EEOC points to, none of which are ageist comments, none of which could support evidence to say that those decisions were pretextual. And if you look at the reasons, why was McGraw laid off? McGraw was laid off because he was in a logistics position. He was in a logistics position that was created by Garza because he had created it at a couple of other plants and he thought it would really drive some efficiencies. It didn't work out. He's not contesting the creation of that position. It's a termination case. This is an EEOC pattern and practice termination case on these three individuals. And with respect to McGraw, there's no question that what happened was the position was eliminated and it was never filled again, never filled again at that plant. Those responsibilities were just taken over by people in other positions. And why was that position eliminated? To drive profitability of that plant that hadn't been profitable for years. And when Neal was terminated, who took over that position? It was Garza. Maschurda said, Garza, you're going to have responsibility here. And guess what? Within eight months, that plant was profitable for the first time in over six and a half years. Okay? Maschurda's comments and his articulated reason on Neal, we've got to turn around this plant. His view was very, very similar to the views which have been accepted by this Court in prior cases, that he didn't have a good faith belief, given everything he had saw and heard and known, that he was going to be able to do it fast enough. And, in fact, he hadn't demonstrated he was able to. And there is no basis to believe that's not true. If you go to McGraw, there's no basis to believe that, in fact, his position wasn't eliminated, because, in fact, Garza wanted to drive the profitability and save fixed costs. In fact, the record evidence is clear that that was part of it. It's in written documents. If you go to the third person who, again, a year and a half later, Mr. Benenko, Mr. Benenko is also laid off. What happens? Mr. Benenko is the controller at the Phoenix plant. And, in fact, a regional controller is moved to the Phoenix plant. So you've got a controller for the Phoenix plant, a number of other plants in the region, and the regional controller moves to the Phoenix plant. And a number of months later, Mr. Garza decides, I'm just going to have that regional controller, who's already there, who's already in a senior position to Mr. Benenko, also do the controller positions for that existing plant. And why did I pick her instead, Ms. Cervantes, instead of Mr. Benenko? Because she already knew, she already had the responsibilities of rolling up all the data, of understanding tax laws. She spoke Spanish. They had plants in Mexico. Part of her responsibilities as a regional controller was also to make sure she could audit and look at and forecast the controlling functions of the other plants. It made all the sense in the world to take those responsibilities and move them to Ms. Cervantes, again, to save costs and try to drive the elimination of fixed costs at that plant. And, in fact, at the time when Mr. Garza, and as long as Mr. Mishurta, had responsibilities for the Phoenix plant, there was never another controller in that plant. The regional controller took over those responsibilities and, in fact, kept them throughout that time. When you look at the cases and you say, you know, what case is this like? This case is like Merrick v. Farmers Insurance. In that case, there were statements that were proffered regarding pretext analysis of a decision maker and the basis that individuals were referred to as young man. If you look at Nids v. Schindler Elevator, there were statements offered in the pretext analysis with supervisors commenting to other employees he wanted to get rid of all the old-timers because they would not kiss his ass. There's no question in this case that there are no such comments directed by either of the decision makers toward the three individuals at issue in terms of their terminations and layoffs here, and that with respect to the comments that do exist, that they focused on the absolute drive of these decision makers to get people in place, and, again, during their tenure, you have people who are in their 50s, in their 40s, in their 60s taking over many of these responsibilities, that it had to do with, are people doing their job? Are people driving the business? Are we going to turn the corner? In fact, when Tin bought the plant, as I believe I mentioned, Tin was concerned about whether it should even keep it in operation. There's no question that that's the case, and those facts are undisputed. Thank you. Thank you, counsel. It's like ships passing in the night in some respects, isn't it? Your Honors have the record in front of you, and you're more than capable of reading the record and seeing what it says. And, you know, the fact that, as we explained in our reply brief, I mean, many of these characterizations of what's in the record are just simply false. I mean, the fact that all three people in this case, both Neal McGraw and Vannecca, were all replaced by people who were significantly younger than them is the absolute truth. You can look all of this up. I want to respond to a few points that defense counsel just made. We did respond in our brief to all three reasons why that Tin proffered for why Neal was fired, and we explained that a reasonable jury could find that all of them were pretexts. But very quickly, to the extent that Tin testifies that Mishurda fired Neal because he didn't get along with his boss, Neal testified about this in his deposition. This is at 2ER 219-20, and he testifies he didn't testify that he didn't get along with Garza. He testifies that he thought that Garza was laid-back and thoughtful, and that, yes, he saw him in some respects as a yes man to Mishurda, but that he considered him honest, well-intended, and relatively personable. And, again, on summary judgment, it's his version of this testimony that's to be credited, not Tin's. And with respect to whether he cared more about getting a severance payout than about his job security, I direct you to 2ER 235-237, which is, again, Neal's testimony on this point. And what he testified was that he did inquire about the terms of the change-of-control agreement, as Tin says, but that his primary concern was with ascertaining the status of his future employment, not whether he was going to get a big payout, since, as defense counsel says, it's undisputed in the record that Tin wasn't even sure whether they were going to continue operating the Phoenix plant. David Neal was understandably concerned about whether he was going to continue to have a job. So on summary judgment, it's his version of the facts that's to be credited, and a reasonable jury could certainly find that those were not sufficient reasons to motivate terminating him. Now, with respect to the issue of who was the decision-maker on these, on the decisions to terminate McGraw and VanEcko, again, we addressed this in our reply brief, but the sworn declarations in the record here are that Mishurda says, this is Mishurda's sworn declaration, Garza consulted with me. Garza's sworn declaration, I consulted with Mishurda. And this is at, it's 3ER-419 and 3ER-430-something or another, but it's their two sworn declarations, we consulted with each other with respect to this decision. That's it. So a reasonable jury could certainly believe their own words that they consulted with each other with respect to the decision, but you don't need to stop there. Think about the testimony in the record about the hiring of Cliff McGraw, all right? Now, this is Mishurda's relationship with his GM, Neal, about hiring a production manager. Did Mishurda just rubber stamp that decision? No, he had an extensive discussion with it. And in fact, as defense counsel reminds us, Mishurda vetoed the hiring of Greg Moss. And I'll remind you that Neal's testimony on that point, which is what's to be credited on summary judgment, is that he, is that Mishurda vetoed hiring Greg Moss because Greg Moss was too old, because of his older age, he lacked energy and vitality, and Mishurda didn't want to see him hired in that position, but he reluctantly allowed Neal to hire Ulrich expressly over his objection that Ulrich might be too old for the job. So you don't only have to take their sworn declarations for, you know, as evidence, you can also look at their, the way that Mishurda interacted with his GM over hiring Ulrich. I see that, I see that my time is up. If there are no further questions. Well, thank you, counsel. We appreciate your arguments. The case is well-argued and briefed, and we appreciate you coming to the Ninth Circuit from your, from the Midwest and the East Coast to argue the case. With that, we'll be in recess for the morning. For the students, we will be back in session with you after conference. Thank you very much.
judges: Wallace, Thompson, Thomas